OPINION OF THE COURT
Frank S. Rossetti, J.
On June 23, 1999, this court rendered a bench decision appointing Joseph Diurno guardian of the person and property of Saverio Conticchio. Mr. Conticchio is diagnosed with schizophrenia and has dementia due to a head injury suffered in a 1995 automobile accident in Florida. By order dated February 27, 1996, a Florida court involuntarily committed him to a Florida hospital because of his mental problems and appointed his mother his guardian in Florida. In April 1997, Mrs. Conticchio and her son moved permanently to Nassau County and the instant proceeding was brought for a guardianship in New York (pursuant to article 81 of the Mental Hygiene Law), with the knowledge and apparent assent of the Florida court. Since 1995 Mr. Conticchio has been receiving medication for his mental condition, and since we found him incapacitated with respect thereto (cf., 182 Misc 2d, at 209, n 1, infra), in our decision we granted the guardian appointed herein the power to consent to or refuse accepted routine or major medical treatment (see, Mental Hygiene Law § 81.22 [a] [8]). Said finding was grounded on the evidence presented, as well as the prior similar, specific finding made by the Florida court in involuntarily committing him. We made a point in our bench decision of referring to the definition of such treatment and the inclusion therein of antipsychotic medication, the type of medication the incapacitated person has been receiving (see, Mental Hygiene Law § 81.03 [i]), because of a recent decision which put into question the constitutionality and efficacy of this court’s grant of such a power under said Mental Hygiene Law provisions (see, Matter of New York Presbyt. Hosp., 181 Misc 2d 142 [Sup Ct, Westchester County, DiBlasi, J.]). The instant memorandum is thus being written to clarify the basis for the determination at bar and to record our disagreement with said Westchester decision, which involved a person found incapacitated by this court and our appointment of a guardian who was given similar treatment powers which the Westchester court effectively nullified. It is the position of this court that the consent of a properly appointed and empowered guardian is *207 generally sufficient to permit the administration of medication to a nonconsenting incapacitated person without the need for additional court proceedings or review.
The basic purpose of Mental Hygiene Law article 81 is to provide guardians for persons who are likely to suffer harm because they are not capable of taking care of themselves or their property. (See, Mental Hygiene Law § 81.02 [b].) Among the changes this article made from the prior conservatorship and committee statutes are the requirements that a guardian be granted only those powers necessary for the personal needs and property management of the incapacitated person and which constitute the least restrictive form of intervention (see, Mental Hygiene Law § 81.02 [a] [2]; see generally, Law Rev Commn Comments, reprinted in McKinney’s Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.02, at 261). The powers are to be tailored to the individual needs of the incapacitated person, taking into account said person’s wishes, preferences and desires, and afford him or her the greatest amount of independence, self-determination and participation in all decisions affecting him or her (see, Mental Hygiene Law § 81.01). However, all these factors are to be considered in light of the incapacitated person’s understanding and appreciation of his or her functional limitations (see, Law Rev Commn Comments, op. cit.). Thus, while the wishes and desires of an incapacitated person should be taken into account, if that person lacks the capacity to make reasoned judgments as to his or her medical treatment because of mental or emotional problems, then such functional limitations justify and warrant the authorization and exercise of treatment powers by a guardian. A schizophrenic may be under the delusion that he or she is cured or is being medicated as part of a plot to take over the universe, but obviously wishes arising from such delusions should not be followed if harmful to his or her treatment (see, ibid.) since they are part of the functional limitations and incapacity which necessitated the guardian’s appointment and powers in the first place. The concept of substituted judgment is an integral part of article 81 (see, Law Rev Commn Comments, op. cit., Mental Hygiene Law § 81.21, at 376) and the whole purpose of appointing a guardian is to make judgments of this type because the incapacitated person is not able to. The specific provision authorizing the power over treatment decisions does state that such should accord with the incapacitated person’s wishes, including religious and moral beliefs (see, Mental Hygiene Law § 81.22 [a] [8]), but the Law Revision Commis *208 sion Comments thereto clarify that the relevant wishes are prior competent ones and the relevant beliefs are ones based on past values and preferences (see, Law Rev Commn Comments, op. cit., Mental Hygiene Law § 81.22, at 389-390). Obviously the Legislature did not intend a guardian to be bound by the delusional wishes of an incapacitated person in the throes of his or her mental disability. In the case of the incapacitated person in the previously noted Westchester decision (181 Misc 2d 142, supra; see, 182 Misc 2d, at 206, supra), it was not shown her refusals were based on said past preferences or beliefs, and her prior history of taking medications indicated she had no previous general or particular aversion thereto. Where a person is found to lack the capacity to make reasoned decisions as to his or her treatment, including the appropriate psychotropic medications, they are a fortiori incapable of giving legal consent to such treatment and medications. For that reason a guardian is appointed to give the consent the incapacitated person is incapable of giving. It makes no sense to empower a guardian to give such consent if the incompetent objection of the incapacitated person can override it. Such then becomes a power without a purpose and, indeed, a power without force or effect.
Our primary disagreement with said Presbyterian decision (supra) is that it essentially disregards the consent to medication given by a properly appointed guardian who was judicially authorized to give such consent under Mental Hygiene Law article 81. Instead, the Westchester court directed that a hearing be held under Rivers v Katz (67 NY2d 485, rearg denied 68 NY2d 808) as if there were no such guardian and no consent by him. Rivers held that an involuntarily committed mental patient has a constitutional right to refuse treatment under the State Due Process Clause (see, Rivers v Katz, supra, at 492, 493; NY Const, art I, § 6) and thus is entitled to a hearing before antipsychotic drugs can be forcibly administered. The language of Mental Hygiene Law § 81.22 (a) (8) and § 81.03 (i) indisputably authorizes a guardian to consent to such medication and the general and particular references to the Rivers decision by the Law Revision Commission which drafted said statute (see, Law Rev Commn Comments, op. cit., Mental Hygiene Law § 81.02, at 259; § 81.03, at 269; § 81.22, at 390) indicate a recognition and perceived consistency therewith (see also, Mental Hygiene Law § 81.10 [c] [4]). Nonetheless, although not specifically stated therein, the logical ultimate import of the Presbyterian decision is that to the extent article 81 authorizes a guardian’s consent to be an alternative to a *209 Rivers hearing, it is unconstitutional and such a consent is unenforceable. However, legislative enactments are entitled to a presumption of constitutionality and are not to be negated unless their constitutional invalidity is established beyond a reasonable doubt. (See, e.g., 20 NY Jur 2d, Constitutional Law, §§ 59, 61, 63, 79, 80.) They are to be harmonized with constitutional requirements and construed so conflicts with such requirements are avoided or reconciled. (See, id., §§ 63-66.) We believe article 81 and the State constitutional requirements of Rivers can be so reconciled, particularly since the presence of a guardian is a material factual difference from the circumstances which were considered in Rivers (see, 182 Misc 2d, at 212-213, infra). Therefore, unless and until the unconstitutionality of the subject statutory provisions is declared by the Court of Appeals or another appellate court, we believe said provisions should be followed and enforced according to their plain language and intent (see, e.g., McKinney’s Cons Laws of NY, Book 1, Statutes §§ 92, 94-97).
The Court of Appeals in Rivers found that at the hearing to be held for a nonconsenting patient the court is to first determine the patient’s specific capacity to make competent decisions as to his or her treatment and second, if incapable of making such decisions, the propriety of the proposed treatment considering, inter alla, the patient’s best interests, the benefits and adverse side effects of the treatment, and any less intrusive alternatives (see, Rivers v Katz, supra, at 497-498). The Presbyterian decision (supra) concedes that a hearing under article 81 provides the procedural protections required under Rivers, but nonetheless still finds a separate additional Rivers hearing is necessary, notwithstanding that the same finding of incapacity under Rivers had already been made in the article 81 hearing before this court,[1] and notwithstanding the same finding of treatment propriety required under Rivers had already been *210 made by the patient’s guardian, pursuant to legislative and judicial authorization and in accordance with the same factors Rivers considered (see, Law Rev Commn Comments, op. cit., Mental Hygiene Law § 81.22, at 390). Seemingly the Presbyterian court believes only a court can make treatment decisions, but Rivers does not require such a conclusion where a guardian is in place (see, 182 Misc 2d, at 212-213, infra) and the Legislature has found otherwise, not only in Mental Hygiene Law article 81, but also in Mental Hygiene Law article 80 and the Public Health Law (see, 182 Misc 2d, at 212, infra).
The Presbyterian decision (supra) starts by quoting Mental Hygiene Law § 81.01 in support of its conclusion that the emphasis therein on the incapacitated person’s wishes and desires shows a legislative intent not to permit a waiver of said Rivers rights. However, this clearly laudable emphasis on the individual should not obscure the noted fundamental and essential purpose of a guardianship, to wit, to provide a surrogate decision maker for someone who is not capable of making reasoned decisions. The Presbyterian court quotes from a prior case as to the primacy of rights under Mental Hygiene Law article 9, the involuntary commitment statute (i.e., Matter of Farbstein, 163 Misc 2d 26), but Mental Hygiene Law § 81.22 (b) (1) clearly states that a guardian cannot consent to even a voluntary commitment and said case thus merely followed the indicated legislative limitation. By specifying the powers which could and could not be granted a guardian under article 81, plainly the Legislature believed that certain decisions have such life or liberty depriving consequences that even a guardian should not be the sole arbiter thereof (see also, Mental Hygiene Law § 81.29 [e]). In the case of antipsychotic drugs, however, the Legislature has specifically included such in the statutory definition of medical treatment decisions which it has specifically provided that guardians can make. (See, Mental Hygiene Law § 81.03 [i].) This is therefore a converse situation to that in Farbstein and that case is thus totally inapposite here. By relying thereon, the Presbyterian court obliterates the distinction between the powers the Legislature has specifically allowed for a guardian and those it has specifically denied.
Said court also quotes a case which states that incompetent patients do not lose their constitutional right to privacy merely because of their incompetency (see, Matter of New York Presbyt. Hosp., 181 Misc 2d, supra, at 411, n 5, quoting Matter of Weinstein, 136 Misc 2d 931, 934), but Rivers makes clear such a right is subject to appropriate compelling State interests, *211 including the State’s parens patriae power to provide care for persons unable to care for themselves because of mental illness (see, Rivers v Katz, supra, at 496, 497). Of course, the sine qua non for the exercise of said power is a determination of incapacity as to treatment decisions, but if a patient’s incompetency encompasses such incapacity, then said right may have to yield to said interests and power (see, supra). Hence, while the noted quote may have validity as a generality, it is not completely accurate or apposite in the particular circumstances here.
The seeming most significant factor in the Presbyterian decision (supra) is the perceived lack in article 81 of any patient right to a review of an initial finding of incapacity. Such a view does not sufficiently value the article 81 provision for modification of powers, to wit, Mental Hygiene Law § 81.36. Under said provision the incapacitated person or anyone concerned with his or her welfare can request a hearing on the continued need for treatment powers (see, Mental Hygiene Law § 81.36 [b], [c]; § 81.06 [a] [6]), and the burden of proof is on the guardian to show by clear and convincing evidence that the incapacitated person is still incapable of making reasoned treatment decisions and the guardian’s powers are still necessary with respect thereto (see, Mental Hygiene Law § 81.36 [d]; Law Rev Commn Comments, op. cit., Mental Hygiene Law § 81.36, at 439). Thus the procedural safeguards in such a review are essentially the same as in an original article 81 hearing and hence concededly compliant with the due process requirements of Rivers (supra).
The Presbyterian determination also cites two Rockland County decisions in support of its findings (i.e., Matter of Shari K., 177 Misc 2d 25; Matter of Gordon, 162 Misc 2d 697), but they too apparently ignore the noted review provisions. The Shari K. case also seemingly did not give adequate consideration to the precise determination subject to mandatory judicial review under Rivers (supra; see, 182 Misc 2d, at 212-213, infra), and it additionally found no cause of action stated under article 81 because the treatment requested (i.e., electroconvulsive therapy, treatment also specifically included within the definition of treatment powers allowed under article 81 [see, Mental Hygiene Law § 81.03 (i)]) was also available and had been previously granted under Mental Hygiene Law article 9. However, such a rationale ignores the benefits of prompt treatment and the unnecessary suffering endured by the incapacitated person while the prerequisite Rivers application is prepared and filed, and a hearing scheduled and held (cf., Mental *212 Hygiene Law § 80.01). It appears from the court evaluator’s report in our article 81 proceeding for the incapacitated person in Presbyterian (supra) that she would suffer screaming nightmares and delusions and other psychological trauma when not taking her prescribed medication. Indeed, the primary reason for said article 81 proceeding was to avoid the continuing repetition of those horrors and the associated detriment they caused to the incapacitated person’s treatment for schizophrenia. The recently passed legislation known as Kendra’s Law (L 1999, ch 408) is based on the dangers that can arise from schizophrenics and other mentally disturbed persons who cease or refuse to take their necessary medication. While said law is apparently based more on the State’s police power (see, Rivers v Katz, supra, at 495-497, 498), it reemphasizes the importance of not permitting interruptions in the treatment of such individuals. Delays in and interruptions of medication resulting from unnecessary judicial requirements should be avoided not merely in the public interest (under the police power), but also in the interest of the incapacitated persons most affected thereby (under the parens patriae power [see, supra]). The noted court evaluator’s report sets out the generally accepted medical belief that schizophrenia is not curable per se, but rather only can be managed by proper medical intervention, including medication. Given this medical prognosis and opinion, it would seem something more should be present than a mere refusal from an untreated incapacitated person in the grip of her disease before judicial intervention is mandated. Arguably there should be some evidence of a change in the person’s capacity or condition (including adverse reactions to medication) before needed treatment is blocked and denied, particularly where such treatment consists of the mere continuation of previously prescribed and successfully administered medication (see, 182 Misc 2d, at 215, n 4, infra). Mental Hygiene Law § 81.36 provides for this.
In Rivers v Katz (supra), the Court of Appeals delineated the procedures to be followed in a certain context, to wit, involuntarily committed mental patients objecting to prescribed anti-psychotic medication. It did not hold that those procedures are invariably required in other circumstances; it only indicated that the relevant due process rights must be adequately protected. Although the Rivers Court did specify that the determination of incapacity was a judicial and not a medical one (see, Rivers v Katz, supra, at 496-497), the Legislature has subsequently found that such a capacity determination could *213 be made in the first instance by a committee, albeit subject to judicial review under a substantial evidence standard (see, Mental Hygiene Law § 80.03 [b]; § 80.07 [e]; § 80.09). However, Rivers did not involve a situation where there is another statutorily authorized surrogate decision maker present. The Court in Rivers had only itself or the State’s doctors to choose between as to who should decide the propriety of the treatment at issue. Significant in this regard is the Court of Appeals criticism of the then-extant administrative review procedure and the lack of standards to be followed by doctors in making said treatment decision (see, Rivers v Katz, supra, at 498). Where a guardian has been appointed under article 81, not only has the prerequisite determination of incapacity been made by a court in accordance with constitutional due process standards, but there are standards specified as to the second determination (i.e., treatment propriety) which are to be followed by a judicial appointee who of necessity is more familiar with the incapacitated person than the court. Indeed, the guardian we appointed in the Presbyterian case (supra) is a family member (a brother) who has a life-long knowledge of the incapacitated person and has exhibited a self-sacrificing concern for her welfare. Given these significant factual differences, we do not believe that language in Rivers arguably indicating a court should also make said second determination (see, Rivers v Katz, supra, at 497-498) is conclusive as to the unconstitutionality of Mental Hygiene Law § 81.22 (a) (8), particularly in view of the presumption of constitutionality attached to said provision (see, 182 Misc 2d, at 209, supra).
The Legislature has indicated by its post -Rivers permanent reenactment of Mental Hygiene Law article 80 (see, L 1990, ch 619, §§ 5, 6; Mem of Commn on Quality of Care for Mentally Disabled, 1990 McKinney’s Session Laws of NY, at 2464-2465; Governor’s Mem approving L 1990, ch 619, 1990 McKinney’s Session Laws of NY, at 2732), as well as the enactment of article 81 (see, L 1992, ch 698, § 6), that it does not believe said case established an invariable constitutional requirement that treatment propriety decisions be made only by a court. Also, at the time Rivers (supra) was decided, there was legislation in place which expressly provided that a patient’s right to refuse medication and treatment, inter alla, “shall” be exercised by the patient’s committee or conservator where there is one. (See, Public Health Law § 2803-c [3] [e], [j].) As the successors to committees and conservators, guardians are equally subject *214 to this provision (see, L 1992, ch 698, § 4 [b], as added by L 1993, ch 32, § 17), and although apparently not applicable to mental health facilities (see, Public Health Law § 2801 [1], [2], [4] [b]; § 2803-c [2]), said provision does declare the public policy of the State (Public Health Law § 2803-c [1]). Such a statute thus supports our interpretation of Mental Hygiene Law article 81 (see, McKinney’s Cons Laws of NY, Book 1, Statutes § 222) and the inapplicability of Rivers where a properly appointed and empowered guardian is in place, at least as to treatment propriety decisions.[2] We believe that a guardian appointed under adequate due process procedures, properly informed in accordance with accepted medical standards (see, Rivers v Katz, supra, at 498-499), having a superior familiarity with the incapacitated person and acting as a fiduciary under mandatory, specific standards (see, Mental Hygiene Law § 81.20 [a] [1]-[3]; Law Rev Commn Comments, op. cit., Mental Hygiene Law § 81.20, at 368), is equally if not more qualified than a court to make such decisions. Given the above-indicated differences and considerations, we accordingly do not find that Rivers requires a finding of unconstitutionality as to a guardian’s power under Mental Hygiene Law § 81.22 (a) (8) to consent to medication over an incapacitated person’s incompetent objection.
Finally, in the Presbyterian case (supra) the issue of the petitioner hospital’s right to rely on the guardian’s consent seemingly should have been referred and transferred to this court under CPLR 2221. Based on this court’s orders under Mental Hygiene Law article 81, the consent of the guardian was facially sufficient to permit administration of the requested medication, at least until his powers were modified pursuant to the appropriate article 81 provision. When it became apparent that ordering a Rivers hearing would effectively render the guardian’s consent a nullity, such a direct impact on our prior orders authorizing that consent should have warranted *215 transfer under CPLR 2221, at least as to our initial order[3] (see generally, 2 Carmody-Wait 2d, NY Prac § 8:109; cf., at 450). The appropriate proceeding was one under the relevant statutory framework and before the court having the relevant jurisdiction over the person of the incapacitated person (see, Matter of Arnold O., 226 AD2d 866, 868, lv denied 88 NY2d 810). Hence, the proper remedy in Presbyterian was modification of our orders by this court, not a de facto disregard thereof by a court of coordinate jurisdiction.[4]
In any event, it is our conclusion that the Legislature intended and properly provided in Mental Hygiene Law article 81 for judicial authorization of guardians to make decisions as to the administration of psychotropic drugs to persons found incapacitated with respect thereto under said statute. The article 81 provisions concerning the authorization and exercise of this power presumptively meet constitutional due process requirements and therefore medical facilities and providers may give such drugs on the basis of a guardian’s consent without the need for further judicial action. To the extent Matter of New York Presbyt. Hosp. (supra) and the similar noted *216 decisions may be read to the contrary, we believe they are inconsistent with the legislative intent and provisions of article 81 of the Mental Hygiene Law.

. The court evaluator’s report, the petition and the testimony of the incapacitated person’s brother in the prior article 81 proceeding before this court presented facts supporting our implicit finding of incapacity to make reasoned decisions as to treatment, particularly as to medication. Said testimony indicated that even though his sister’s condition would deteriorate to the point of dangerousness when she failed to take her medication, she would persist in such conduct for no indicated competent reason, and her prior hospitalizations and involuntary commitments evidenced her continued inability to make reasoned decisions as far as taking her medication and avoiding such untoward circumstances. Said finding was implicit since we only granted powers required by the incapacitated person’s incapacity, as mandated under article 81 (see, Mental Hygiene Law §§ 81.01, 81.02 [a] [2]; § 81.03 [d]; § 81.15 [b] [5]; § 81.16 [c] [2]; § 81.21 [a]; § 81.22 [a]).

. We note that other States (including one where a constitutional right of privacy is expressly recognized [see, e.g., Jarvis v Levine, 418 NW2d 139, 148-149 (Minn 1988)]) have upheld treatment propriety decisions by guardians without the need for further court review. (See, Matter of Blilie, 494 NW2d 877, 880, 883-884 [Minn 1993]; In re Willis, 74 Ohio App 3d 554, 559, 599 NE2d 745, 748 [1991].) Also, requiring judicial determination of treatment propriety as well as treatment incapacity seemingly well exceeds Federal constitutional requirements (see, Hightower v Olmstead, 959 F Supp 1549, 1567-1568 [1996], affd 166 F3d 351 [1998]).

. Our later, amended order was ex parte and thus technically excepted from said transfer requirement (see, CPLR 2221 [a] [2]). We note relative to this order that the Presbyterian court presumed that it added to the guardian’s powers the right to waive the incapacitated person’s rights to a hearing under Rivers (supra) and Mental Hygiene Law article 33. Aside from the fact said order does mention said words, it should have been clear from the circumstances surrounding the order that it was issued as an accommodation to the guardian to clarify his powers for the hospital which was questioning their extent. Contrary to the Presbyterian court’s conclusion, this order did not increase or modify the powers authorized in the prior, initial order, but rather reiterated the treatment power in terms of the statutory definition thereof (i.e., Mental Hygiene Law § 81.03 [i]) and the statutory effect given comparable surrogate decisions (see, Mental Hygiene Law § 80.07 [f]). It simply made explicit that which was implicitly incorporated within said power by statute and thus merely clarified the legal consequences of our prior findings. Thus this court did not violate statutory requirements by modifying powers without the mandated notice and hearing (see, Mental Hygiene Law § 81.36 [c]; cf., Matter of New York Presbyt. Hosp., 181 Misc 2d, supra, at 414, n 7).

. We also note that the Presbyterian court erroneously considered collateral estoppel relative to our amended order. That order did not and did not purport to make any finding of incapacity and, as indicated, only recited the legal consequences of our initial order (see, 182 Misc 2d, at 215, n 3, supra). Said initial order was the determinative one and said court conceded that order met the considered collateral estoppel requirements (see, Matter of New York Presbyt. Hosp., 181 Misc 2d 142, supra).