[823 NYS2d 497]

In the Matter of Rʜᴏᴅᴀɴɴᴀ C.B., Appellant. Pᴀᴍᴇʟᴀ B. et al., Respondents.

Second Department, October 31, 2006

**APPEARANCES OF COUNSEL**

*Mental Hygiene Legal Service,* Mineola (*Sidney Hirschfeld, Felicia B. Rosen* and *Dennis B. Feld* of counsel), for appellant.

**OPINION OF THE COURT**

MASTRO, J.

We hold today that the Supreme Court's appointment of guardians pursuant to Mental Hygiene Law article 81 with the authority to consent in perpetuity to the administration of psychotropic medication to their ward, over her objection and without any further judicial review or approval, is inconsistent with the due process requirements of *Rivers v Katz* (67 NY2d 485 [1986]). Accordingly, we reverse the judgment insofar as appealed from.

This proceeding involves a petition by the two children of Rhodanna C.B. to be appointed the guardians of the personal needs of their middle-aged mother, an alleged incapacitated person who previously has undergone psychiatric hospitalization and who currently lives at home. Following a brief hearing at which no medical testimony or expert evidence was adduced, the Supreme Court rendered a judgment which not only granted the petition to appoint the guardians based on Rhodanna's perceived lack of mental capacity, but which also effectively authorized the guardians to consent to the administration of psychotropic drugs or electroconvulsive therapy to Rhodanna over her objection, without any durational limitation on that authority or judicial review of Rhodanna's capacity or the propriety and necessity of the proposed medical treatment. This aspect of the judgment runs afoul of the due process considerations discussed in the *Rivers v Katz* (*supra*) decision.

In *Rivers v Katz* (*supra*), the Court of Appeals considered the circumstances under which a mentally ill patient who has been involuntarily confined to a state facility can be administered psychotropic drugs over his or her objection. The Court began

its analysis by making reference to the fundamental principles of patient autonomy underlying such a determination:

> "In our system of a free government, where notions of individual autonomy and free choice are cherished, it is the individual who must have the final say in respect to decisions regarding his [or her] medical treatment in order to insure that the greatest possible protection is accorded his [or her] autonomy and freedom from unwanted interference with the furtherance of his [or her] own desires. This right extends equally to mentally ill persons who are not to be treated as persons of lesser status or dignity because of their illness" (*Rivers v Katz, supra* at 493 [citations omitted]).

Noting the potentially devastating side effects of psychotropic drugs, the Court reasoned that before a patient could be forcibly medicated with such drugs pursuant to the State's parens patriae power, "there must be a judicial determination of whether the patient has the capacity to make a reasoned decision with respect to proposed treatment" (*Rivers v Katz, supra* at 497; *see e.g. Matter of William S.*, 31 AD3d 567 [2006]; *Matter of Michael L.*, 26 AD3d 381 [2006]; *Matter of Joseph O.*, 245 AD2d 856 [1997]). In the event that the patient's lack of capacity to determine the course of his or her own treatment is demonstrated by clear and convincing evidence, then

> "*the court* must determine whether the proposed treatment is narrowly tailored to give substantive effect to the patient's liberty interest, taking into consideration all relevant circumstances, including the patient's best interests, the benefits to be gained from the treatment, the adverse side effects associated with the treatment and any less intrusive alternative treatments" (*Rivers v Katz, supra* at 497-498 [emphasis supplied]).

Again, the burden is on the party advocating the therapy "to establish by clear and convincing evidence that the proposed treatment meets these criteria" (*id.* at 498).

In the present case, Rhodanna is not an institutionalized patient, although it has been determined that she suffers from mental illness. Moreover, no attempt has yet been made to medicate her with psychotropic drugs against her will. Nevertheless, pursuant to Mental Hygiene Law § 81.22 (a) (8), the Supreme Court has authorized the guardians to consent to such

a course of treatment over Rhodanna's objection and without further court approval, if they, in their sole discretion, deem it to be appropriate at some point, no matter how far in the future.

To be sure, as our dissenting colleague notes, the statute empowers the court to authorize a guardian to "consent to or refuse generally accepted routine or major medical . . . treatment" (Mental Hygiene Law § 81.22 [a] [8]), which by definition includes "the administration of psychotropic medication or electroconvulsive therapy" (Mental Hygiene Law § 81.03 [i]). Moreover, as evidenced by its acknowledgment of the *Rivers v Katz* (*supra*) decision in enacting Mental Hygiene Law § 81.22, the Legislature was aware of, and presumably was convinced that the statute comported with, its holding (*see* Law Rev Commn Comments, reprinted in McKinney's Cons Laws of NY, Book 34A, following Mental Hygiene Law § 81.22, at 274). However, since such an approach does not provide for an automatic judicial reassessment of the mental capacity of an incapacitated person who objects to treatment *at the time the treatment is proposed*, and does not require that *any* judicial assessment of the necessity and propriety of the proposed treatment *ever* be conducted, the grant of this authority fails to comport with the multiple-step inquiry designed to safeguard the rights of the incapacitated person as set forth in *Rivers v Katz* (*supra*).

As to the first prong of the *Rivers v Katz* (*supra*) analysis, we agree with the Supreme Court and the dissent that when a court is asked to appoint a guardian of the personal needs of an alleged incapacitated person pursuant to Mental Hygiene Law article 81, it conducts a constitutionally adequate inquiry into the mental capacity of the person when it follows the procedures set forth in the article. Indeed, under Mental Hygiene Law § 81.02 (b), a finding of incapacity must be based on clear and convincing evidence that the person is unable to provide for his or her own personal needs and cannot adequately understand and appreciate the nature and consequences of such inability. This finding must be preceded by the appointment of a court evaluator pursuant to Mental Hygiene Law § 81.09, who has the duty to interview or consult professionals regarding the person's alleged incapacity (*see* Mental Hygiene Law § 81.09 [c] [6]), to retain an appropriate medical expert where the court deems it appropriate (*see* Mental Hygiene Law § 81.09 [c] [7]), to apply to the court for permission to inspect the person's medical, psychological, and psychiatric records (*see* Mental Hygiene Law

§ 81.09 [d]), and to provide the court with a written report and recommendation regarding the petition to appoint a guardian (*see* Mental Hygiene Law § 81.09 [c] [5]). Moreover, the alleged incapacitated person has the right to counsel (*see* Mental Hygiene Law § 81.10), and the court must hold a hearing (*see* Mental Hygiene Law § 81.11). Finally, in rendering a determination as to incapacity, the court must make specific findings on the record pursuant to Mental Hygiene Law § 81.15 (b). Therefore, the *initial* determination as to capacity in a Mental Hygiene Law article 81 proceeding comports with the due process requirements set forth in *Rivers v Katz (supra)* (*see Matter of New York Presbyt. Hosp., Westchester Div. [J.H.L.]*, 181 Misc 2d 142, 147 [1999] ["the article 81 procedures . . . provide an individual with the procedural protections required under *Rivers (supra)* in the case of a person who objects to a proposed treatment plan"]).

However, neither Mental Hygiene Law article 81 nor the judgment appealed from expressly requires a judicial reassessment of Rhodanna's capacity to make treatment decisions at any point in the future, even many years following the appointment of a guardian. Indeed, the guardians of Rhodanna have been appointed for an indefinite duration, and are authorized to consent to the administration of psychotropic drugs or electroconvulsive therapy over Rhodanna's objection at any point in the future, regardless of her possible regaining of capacity, without further judicial intervention. Conversely, *Rivers v Katz (supra)* mandates that a new determination as to capacity be made each time that a medical provider seeks to administer such a course of treatment to an objecting patient, apparently acknowledging that "the finding that a mentally ill person is unable to make a reasoned decision as to the proposed treatment does not constitute a determination binding in futuro" and "there is recognition of the potential for change in the mental status of a person found to be incapable of deciding a medical treatment issue for himself [or herself]" (*Matter of New York Presbyt. Hosp., Westchester Div. [J.H.L.], supra* at 149-150; *see Matter of Shari K.*, 177 Misc 2d 25, 27 [1998] ["(a)ssuming that (the alleged incapacitated person) is found to be incapacitated pursuant to Mental Hygiene Law § 81.02 (b), to grant (the proposed guardian) the power, with unlimited duration, to consent to the administration of (electroconvulsive therapy) to (the alleged incapacitated person) pursuant to a guardianship appointment, would deprive her of the due process rights and requisite judicial review mandated by *Rivers v Katz*"]).

Hence, the foregoing decisions recognize that a person's mental capacity can change over the course of time, and due process requires that the question of capacity be evaluated each time the administration of psychotropic medication or electroconvulsive therapy is proposed over the patient's objection. This is especially true in the case of a person such as Rhodanna, who is relatively young and may have guardians for another 30 years or more, during which time her degree of mental capacity may change quickly and dramatically, perhaps as a result of sound medical decisions made by those very guardians. To hold, as the Supreme Court did, that the single determination of lack of capacity made in this Mental Hygiene Law article 81 guardianship proceeding may forever after deprive Rhodanna of an automatic judicial reassessment of her capacity in the event that such extraordinary medical therapies are proposed against her will in the distant future, affords her far less due process protection than an involuntarily-committed patient who has no guardian at all.

In this regard, Mental Hygiene Law §§ 81.30, 81.31 and 81.36 (a) (1) and the reasoning in *Matter of Conticchio* (182 Misc 2d 205 [1999]) offer little solace to an incapacitated person who objects to such treatment. While Mental Hygiene Law §§ 81.30 and 81.31 provide for the filing of periodic reports with the court regarding the condition of the incapacitated person and the management of her property, there is nothing in those statutes, or in the judgment appealed from, mandating an assessment of the person's current or prospective ability to consent to the narrow categories of extraordinary medical intervention under discussion here *at the time they are proposed*. Moreover, Mental Hygiene Law § 81.36 (a) (1) provides that a guardian, the incapacitated person, "or any person entitled to commence a proceeding under this article" (Mental Hygiene Law § 81.36 [b]) may apply to the court to discharge a guardian or modify his or her powers if it is demonstrated that "the incapacitated person has become able to exercise some or all of the powers necessary to provide for personal needs . . . which the guardian is authorized to exercise." The burden of proof upon an application to terminate the guardianship or restore certain powers to the incapacitated person "shall be on the person objecting to such relief" (Mental Hygiene Law § 81.36 [d]). In *Matter of Conticchio* (*supra*), the court reasoned that since an incapacitated person or anyone concerned with his or her welfare may make such an application, a ward can always obtain

a reassessment of his or her own mental capacity before treatment, thereby satisfying *Rivers v Katz (supra)*. However, unlike in *Rivers v Katz (supra)*, in which the entity advocating psychotropic drug treatment or electroconvulsive therapy must apply to the court for permission to act each time the therapy is proposed, Mental Hygiene Law § 81.36 places the onus *on the incapacitated person*, or someone acting on her behalf, to formally object to the continued exercise of powers by the guardian in this regard. In the absence of such an affirmative objection and an application to remove the guardian or limit his powers, the issue of mental capacity in the face of the proposed treatment is never revisited by the court. Furthermore, even the limited opportunity for ongoing judicial oversight on the issue of capacity provided by this statute would frequently prove illusory, since it is unlikely that the guardian himself will seek to limit or terminate his own powers, and it is unrealistic to expect the incapacitated person to be aware of and exercise this right, especially where she is mentally ill, is not represented by counsel, and may already be laboring under the effects of drug therapy. Given these substantial shortcomings, we are compelled to conclude that the mechanism in Mental Hygiene Law § 81.36 fails to provide a constitutionally satisfactory substitute for the procedures outlined in *Rivers v Katz (supra)* for ensuring the timely judicial review of the incapacitated person's ability to make her own decisions regarding treatment with psychotropic drugs or electroconvulsive therapy.

The second inquiry required under the *Rivers v Katz (supra)* analysis is glaringly absent from Mental Hygiene Law article 81 and from the judgment in this case. As noted earlier, once a lack of capacity is determined, *Rivers v Katz (supra)* requires that before an incapacitated patient can be compelled to undergo psychotropic drug treatment against her expressed wishes, *the court* must ascertain whether the proposed treatment is narrowly tailored to recognize the liberty interest of the patient, taking into account the patient's best interests, the potential benefits and adverse side effects associated with it, and any less intrusive alternative treatment regimens (*Rivers v Katz, supra* at 497-498). There is simply no analogue to this judicial inquiry in Mental Hygiene Law article 81 or in the judgment before us. Rather, Mental Hygiene Law § 81.22 (a) (8) authorizes the appointing court to empower *the guardian* to consent to the administration of, inter alia, psychotropic drug treatment or electroconvulsive therapy to an incapacitated person over her

objection, albeit upon

> "a consideration of the dignity and uniqueness of every person, the possibility and extent of preserving the person's life, the preservation, improvement or restoration of the person's health or functioning, the relief of the person's suffering, the adverse side effects associated with the treatment, any less intrusive alternative treatments, and such other concerns and values as a reasonable person in the incapacitated person's circumstances would wish to consider" (Mental Hygiene Law § 81.22 [a] [8]).

While these factors are similar to those set forth in *Rivers v Katz* (*supra*), Mental Hygiene Law § 81.22 (a) (8) permits the guardian to consent to such therapy without the court *ever* conducting *any* inquiry into the nature, efficacy, or necessity of the treatment.

Likewise, the judgment in this case requires no judicial involvement in the event that psychotropic drug treatment or electroconvulsive therapy is proposed for Rhodanna over her objection at some point in the future. Rather, it cedes the authority to weigh the medical evidence and decide the treatment issue to her guardians. Such an approach is contrary to the express holding in *Rivers v Katz* (*supra*), as well as to the reasoning of numerous other decisions which have recognized the necessity and value of requiring that a *court* conduct a thorough inquiry and weigh the evidence on both sides of the treatment issue before determining whether and to what extent such treatment should be forced upon an incapacitated person (*see e.g. Matter of Gregory F.*, 292 AD2d 606 [2002] [matter remitted for the appointment of an independent psychiatric expert who can provide the court with a second opinion so that it can determine whether the proposed treatment is narrowly tailored to protect the patient's liberty interest]; *Matter of Kings Park Psychiatric Ctr. [Gerald L.]*, 204 AD2d 724 [1994] [court should have ordered independent psychiatric evaluation to determine whether prescribed antipsychotic medication is appropriate to administer over the objection of involuntarily committed mentally ill patient]; *Matter of Mary Ann D.*, 179 AD2d 724 [1992] [hearing evidence regarding goal of proposed treatment and potential side effects supported court's determination that closely-monitored program designed to stabilize patient was narrowly tailored to preserve her liberty interest]; *Matter of McConnell*, 147 AD2d 881 [1989] [clear and convincing medical

and psychiatric evidence adduced at judicial hearing regarding patient's best interests, potential benefits and hazards of intended psychotropic drug treatment, and lack of less intrusive alternatives established that proposed treatment was narrowly tailored to protect patient's liberty interest]; *Matter of Shari K.*, 177 Misc 2d 25, 27 [1998], *supra* ["to grant (the guardian) the power, with unlimited duration, to consent to the administration of (electroconvulsive therapy) to (the patient) pursuant to a guardianship appointment, would deprive (the patient) of the due process rights and requisite judicial review mandated by *Rivers v Katz (supra)*"]; *Matter of Gordon*, 162 Misc 2d 697 [1994] [proposed guardian's request for authority to compel alleged incapacitated person to receive psychotropic medication against her will in the future was denied; the proper remedy is to seek permission pursuant to *Rivers v Katz (supra)*]).

Notwithstanding the plain language in *Rivers v Katz (supra)*, our dissenting colleague relies upon the decision in *Matter of Conticchio (supra)* in finding that when a guardian has been appointed for an incapacitated person, the guardian rather than the court may apply the requisite factors and make such treatment decisions. However, there are compelling reasons for adhering to the requirement in *Rivers v Katz (supra)* that those decisions be made by the court in the context of a judicial proceeding. A guardian is likely to lack that degree of medical and psychiatric knowledge possessed by a court which regularly conducts hearings into such treatment questions. Hence, while a guardian may seek a second opinion when confronted with a recommendation of a course of psychotropic drug therapy by a treating physician, there is no requirement in article 81 that he do so, nor is it realistic to assume that every guardian will even possess the level of sophistication necessary to appreciate his ward's condition and the true necessity and impact of the proposed treatment. Therefore, a genuine danger exists that the guardian will merely "rubber stamp" the treatment recommendation. Conversely, when a court is the arbiter of the propriety of the proposed treatment, the issues are fully explored in the context of an adversarial proceeding in which the parties are represented by counsel, medical evidence and other proof may be presented on both sides of the issue, witnesses may be subjected to the crucible of cross-examination, the court may appoint independent and disinterested experts to aid it in evaluating the incapacitated person's true condition and the overall efficacy of the proposed treatment, and the propriety of

the treatment must be demonstrated by clear and convincing evidence (*see Matter of Paris M. v Creedmoor Psychiatric Ctr.*, 30 AD3d 425 [2006]; *Matter of Mausner v William E.*, 264 AD2d 485 [1999]). Similarly, the court acts as an impartial decision maker, unfettered by the personal interests and concerns which could influence the treatment decision made by a guardian. Indeed, regardless of how well-intentioned a guardian may be, the pressures, difficulties, and expense in dealing with the incapacitated person on a regular basis over the course of time may lead him or her to consent to a treatment plan on behalf of his or her unwilling ward in an unrealistic attempt to cure the person, or in an effort to control erratic or embarrassing conduct by medicating the person to maintain the ward in a docile state. This is particularly true when, as in this case, the guardianship is unlimited in duration and may last for decades, during which time the guardian's own circumstances and priorities may change considerably. There is a real possibility that in such cases, no matter how altruistic the motives of a guardian may be at the time of his appointment, the liberty interest of the incapacitated person may give way to the convenience of the guardian in the ensuing years. Therefore, a guardian is not an adequate substitute for a court in making such decisions.

In reaching our conclusion, we are not unmindful of the presumption of constitutionality which attaches to legislation, as well as of the heavy burden shouldered by those who challenge a statute on the ground that it fails to pass constitutional muster (*see LaValle v Hayden*, 98 NY2d 155, 161 [2002]). Likewise, we acknowledge the principle that legislation must be interpreted in such a manner as to render it constitutional whenever possible (*see National Assn. of Ind. Insurers v State of New York*, 89 NY2d 950, 952 [1997]). Indeed, it is precisely that principle which compels us to construe Mental Hygiene Law article 81 as including a *Rivers v Katz* (*supra*) hearing requirement in those limited circumstances where a ward objects to the proposed administration of psychotropic drugs or electroconvulsive therapy.

Accordingly, the protection of the liberty interest and autonomy of an incapacitated person, the cornerstone of the decision in *Rivers v Katz* (*supra*) and of Mental Hygiene Law article 81 itself, is achieved only when a guardian's consent to a proposed course of psychotropic drug treatment or electroconvulsive therapy over his ward's objection is subjected to the multiple due process safeguards afforded by an adversarial

proceeding before an impartial judicial decision-maker who considers both the current mental capacity of the person and the propriety of the proposed treatment. Since the judgment at issue fails to provide these fundamental protections, it should be reversed insofar as appealed from.

In view of the foregoing, we have no occasion to reach the merits of the appellant's additional substantive contentions.

Accordingly, the judgment is reversed insofar as appealed from, on the law, and a provision is added thereto directing the petitioners not to authorize the administration of psychotropic medication or electroconvulsive therapy to Rhodanna C.B. without her consent or a further order of the court following a hearing.

LUCIANO, J. (dissenting). I do not agree with my colleagues in the majority that the judgment in this Mental Hygiene Law article 81 proceeding violates the due process concerns addressed in *Rivers v Katz* (67 NY2d 485 [1986]), insofar as it does not provide that the appointed guardians for the incapacitated person's personal needs are not authorized to consent to the administration of psychotropic medication over the incapacitated person's objection.

Mental Hygiene Law article 81 requires that in order for a personal needs guardian with the authority to make major medical decisions to be appointed, there must be a judicial determination that the alleged incapacitated person lacks the capacity to make such determinations for himself or herself, and requires that the powers granted by the court and exercised by the guardian are the least restrictive form of intervention necessary for the particular individual under the circumstances. The overriding theme pervading Mental Hygiene Law article 81 is that the incapacitated person should be permitted to retain as much autonomy and self-determination as he or she is capable of in light of his or her functional limitations, and where those limitations render the individual incapable of making particular decisions, a guardian is allowed to substitute his or her judgment for the incapacitated person's, always with the best interests and liberty interests of the incapacitated person as paramount factors. As such, the constitutional rights recognized and safeguarded by *Rivers v Katz* (67 NY2d 485 [1986]) are not offended by a court authorizing a personal needs guardian to consent to the administration of psychotropic medication to an incapacitated person, when the statutory criteria of lack of capacity to make such decision, and least restrictive alternative are satisfied.

As articulated in *Rivers v Katz* (*supra*), the fountainhead for the right of a mentally incapacitated person to accept or reject medical treatment protocols, including the administration of psychotropic drugs, is the Due Process Clause of the New York State Constitution. *Rivers v Katz* (*supra*) was decided before the enactment of Mental Hygiene Law article 81, and it is ineluctable that, in the absence of a duly-appointed guardian, the requirement that a *Rivers v Katz* hearing be conducted before the administration of any psychotropic medication over an individual's objection is alive and well.

In enacting Mental Hygiene Law article 81, the New York State Legislature made expansive inquiry into the protection of due process rights of a putative mentally incapacitated person, and the Law Revision Commission Comments to article 81 are punctuated by references to *Rivers v Katz* (*supra*; *see* Law Rev Commn Comments, reprinted in McKinney's Cons Laws of NY, Book 34A, following Mental Hygiene Law §§ 81.02, 81.03). Moreover, the legislation is presumptively constitutional.

Mental Hygiene Law § 81.22 (a) (8) authorizes a court to grant a guardian the power to "consent to or refuse generally accepted routine or major medical or dental treatment" on the incapacitated person's behalf. Mental Hygiene Law § 81.03 (i) defines "major medical or dental treatment" as including treatment "which involves the administration of psychotropic medication or electroconvulsive therapy." It is thus clear that the New York State Legislature intended, in enacting Mental Hygiene Law § 81.22 (a) (8) and § 81.03 (i), to authorize the court to empower an appointed guardian to consent to the administration of psychotropic medication to an incapacitated person, without the necessity of a *Rivers v Katz* hearing.

*Rivers v Katz* (*supra*) held that before mind-altering drugs can be administered to an individual over his or her objection, there must be a judicial determination that the individual lacks the capacity to decide for himself or herself whether to consent to such treatment. If the individual has the capacity to make a reasoned decision, then the medication cannot be administered over his or her objection. If a court determines that the patient lacks such capacity, then

> "the court must determine whether the proposed treatment is narrowly tailored to give substantive effect to the patient's liberty interest . . . taking into consideration all relevant circumstances,

including the patient's best interests, the benefits to be gained from the treatment, the adverse side effects associated with the treatment and any less intrusive alternative treatments" (*id.* at 486-487).

In a Mental Hygiene Law article 81 proceeding, before granting a petition for the appointment of a guardian of the personal needs of an alleged incapacitated person who does not consent to the guardian's appointment, the court must find by clear and convincing evidence that the alleged incapacitated person is unable to provide for his or her personal needs and lacks understanding and appreciation of such inability (*see* Mental Hygiene Law § 81.02 [b] [1], [2]).

The court is required to make specific findings concerning the incapacitated person's functional limitations which impair his or her ability to provide for personal needs, and the person's lack of understanding of the nature and consequences of those limitations (*see* Mental Hygiene Law § 81.15 [b] [1], [2]). The statutory standard for appointment of a guardian in a Mental Hygiene Law article 81 proceeding satisfies the *Rivers v Katz* (*supra*) requirement of a judicial determination of whether the person has the capacity to make a reasoned decision regarding treatment.

If, after a *Rivers v Katz* hearing, an individual is found by the court to lack capacity to make a reasoned treatment decision, then before the treatment can be administered over objection, there must be a showing that "the proposed treatment is narrowly tailored to give substantive effect to the patient's liberty interest . . . taking into consideration all relevant circumstances, including the patient's best interests, the benefits to be gained from the treatment, the adverse side effects associated with the treatment and any less intrusive alternative[s]" (*id.* at 486-487). Under Mental Hygiene Law article 81, the court appointing a guardian is only permitted to grant such powers "which constitute the least restrictive form of intervention," in light of the individual's specifically delineated functional limitations and lack of appreciation of the nature and consequences of such limitations (*see* Mental Hygiene Law § 81.15 [b] [5]). A guardian who has been given the authority to make major medical decisions on behalf of an incapacitated person, moreover, is required to consider the same factors as set forth in *Rivers v Katz* (*supra*) as pertinent to the determination of whether the proposed treatment is narrowly tailored to give substantive effect to the individual's liberty interest, in making a decision as

to whether to consent to or refuse medical treatment (*see* Mental Hygiene Law § 81.22 [a] [8]).

The focus throughout Mental Hygiene Law article 81 on limiting a guardian's authority to what is "necessary to assist the person in providing for personal needs," in order to "accomplish the least restrictive form of intervention" (Mental Hygiene Law § 81.16 [c] [1]), satisfies the *Rivers v Katz* (*supra*) "narrowly tailored" criteria.

I disagree with the majority's contention that due process requires that the narrow tailoring requirement can only be satisfied in a judicial proceeding. While *Rivers v Katz* (*supra*) states that a determination of incapacity is a uniquely judicial function, it does not purport to require that the determination of whether, taking into consideration all relevant considerations, the proposed treatment is narrowly tailored to give substantive effect to the individual's liberty interest, be decided in a judicial forum. While the majority posits that a guardian, whether or not a family member, may be motivated by inappropriate factors to support forced treatment with psychotropic medication, in this case a review of the record satisfies *me* that the coguardians of the incapacitated person's personal needs, her two children, have altruistic intentions arising out of their concern for the well-being of their mother. Insofar as the motives of a guardian may prove to be a concern in other guardianship proceedings, the appointing court is in the best position to assess the propriety of granting a guardian the power to consent to the administration of psychotropic medication to an incapacitated person, and when there is a doubt the court should not grant such authority, in which case a *Rivers v Katz* hearing would be required before the proposed treatment could be dispensed.

I do not agree with the majority that permitting a court to grant a guardian the authority to consent to the administration of psychotropic medication or electroconvulsive therapy violates due process because there is no ongoing review of the individual's mental capacity to make a reasoned medical treatment decision. That argument was the basis for the holding in *Matter of New York Presbyt. Hosp., Westchester Div. (J.H.L.)* (181 Misc 2d 142, 147 [1999]) which, although recognizing that article 81 "provide[s] an individual with the procedural protections required under *Rivers*," nevertheless held that a guardian could not be authorized to consent to the administration of psychotropic medication over the objection of an incapacitated person, without first conducting a *Rivers v Katz* hearing. However, as

stated by the late Court of Claims Judge Frank S. Rosetti in *Matter of Conticchio* (182 Misc 2d 205, 211 [1999]):

> "Such a view does not sufficiently value the article 81 provision for modification of powers, to wit, Mental Hygiene Law § 81.36. Under said provision the incapacitated person or anyone concerned with his or her welfare can request a hearing on the continued need for treatment powers (*see,* Mental Hygiene Law § 81.36 [b], [c]; § 81.06 [a] [6]), and the burden of proof is on the guardian to show by clear and convincing evidence that the incapacitated person is still incapable of making reasoned treatment decisions and the guardian's powers are still necessary with respect thereto (*see,* Mental Hygiene Law § 81.36 [d]; Law Rev Commn Comments, *op. cit.,* Mental Hygiene Law § 81.36, at 439). Thus the procedural safeguards in such a review are essentially the same as in an original article 81 hearing and hence concededly compliant with the due process requirements of *Rivers* (*supra*)."

The majority opines that the continued oversight contemplated by Mental Hygiene Law § 81.36 will often prove illusory. However, an incapacitated person who has regained the capacity to make his or her own reasoned medical treatment decisions will presumably also be capable of seeking legal representation for the purpose of exercising the right to seek modification or termination of the guardian's powers.

Based on all the foregoing, I believe that the judgment should be affirmed insofar as appealed from.

RITTER, J.P., and SKELOS, J., concur with MASTRO, J.; LUCIANO, J., dissents and votes to affirm the judgment insofar as appealed from in a separate opinion.

Ordered that the judgment is reversed insofar as appealed from, on the law, without costs or disbursements, and a provision is added thereto directing the petitioners not to authorize the administration of psychotropic medication or electroconvulsive therapy to Rhodanna C.B. without her consent or a further order of the court following a hearing.